(33 South. 98.)

No. 14,212.

MAYARD et al. v. LAPORTE.*

(June 21, 1902.)

SALE—SETTING ASIDE—LESION BEYOND MOIETY.

1. To support an action to set aside a sale for lesion beyond moiety, the proof of the value of the property must be strong and conclusive.

(Syllabus by the Court.)

Appeal from judicial district court, parish of Vermilion; Minos T. Gordy, Jr., Judge.

Action by Euranie Mayard and others against Theodore Laporte. Judgment for plaintiffs, and defendant appeals. Reversed.

Edwards & Greene, for appellant. Breaux & Gordy, for appellees.

PROVOSTY, J. The object of this suit is to set aside, on the ground of lesion beyond moiety, a sale made by C. T. Guidry to the defendant, Laporte. The vendor died a few months after making the sale, and this suit is brought by his widow and his heirs. The property is a lot of ground, with buildings on it, situated at the corner of State and Lafayette streets, in the town of Abbeville. The date and the price of the sale have to be borne well in mind for the understanding of what is to follow. The date was February 21, 1900, and the price $1,700, with two mortgages to be added thereto, making a total of $1,777.05. The question in the case is, there-

*Rehearing denied December 15, 1902.

fore, whether the property was worth more than twice that amount, or more than $3,554.-10, on the day of the sale.

In considering this question we have to hear what the property owners and business men of the town have to say concerning the value of the property. If anybody knows this value, they do. Also we have to compare the sale with other sales of similar property; also with bona fide offers to purchase similar property.

On the Part of Plaintiff.

Mr. Gus. Godchaux, a prominent business man, considers that at the time of the sale the property, at a fair market value, was worth $4,500.

Mr. Ophelias Bourque, another prominent business man, is of the same opinion.

Mr. George Rice, contractor and carpenter, considers that the buildings on the property are worth $700.

Mr. W. D. Wall, carpenter and contractor, is of the same opinion. Does not know what the value of the property was at the time of the sale, but would have paid $2,000 for it as a speculation, and $2,000 more if he had needed the property.

On the Part of Defendant.

Mr. V. L. Caldwell, bricklayer and contractor, thinks that if a man, at the time of the sale, had paid $2,500 for the property, he would have paid a pretty good price.

Mr. D. L. McPherson has several different businesses, but supposes one is sufficient to mention,—insurance. Buys and sells real estate occasionally. Offered $2,500 for the property on the day after the sale. Considers that a fair valuation. Had occasion, as insurance agent, to examine the buildings thoroughly, and placed an estimate of $400 on them "as the very top figure I would give him."

Mr. Joseph Q. Le Blanc, assistant cashier of the Bank of Vermilion, also notary public, also for the last eight years deputy clerk and recorder, values the property at the time of the sale at $2,500 to $2,600.

Mr. Eraste Mouton, owns two houses in the town, is in the livery stable business, buys and sells cattle and mules. Thinks $3,000 would have been a full and high price for the property on the day of the sale.

Mr. W. D. Gooch, dealer in real estate,

would say the property was worth probably $2,000, or a little more.

Mr. E. M. Stebbins, lumber dealer, offered Laporte $500 profit on his investment, and would not offer any more. Did not consider the property was worth more at that time.

Mr. John Erwin. builder. The property was worth not less than $2,000 and not more than $2,500 at the time of sale.

Mr. R. H. Mills, in the drug business, and owner of real estate. The property was worth not more than $2,000 at the time of the sale.

Mr. J. R. Leguener, mayor of the town, says that $2,500 would have been a good price for the property.

Judge W. W. Edwards thinks $2,000 would have been a fair valuation at the time of the sale.

Mr. Sostene Herpin, in the business of farming and selling wood: The property was worth from $2,000 to $2,500.

Mr. Adam Brasseux, in the saloon business, was consulted by Laporte on the day before the sale in regard to buying for $1,700, and advised him to buy at that price, but not to give over $2,200 or $2,300.

Mr. Jean Abadie, property owner on same street, thinks the property was worth about $2,000 to $2,400.

Mr. John B. Shaw, works in assessor's office, and is justice of the peace; also has frequently occasion to examine records, and to act as crier in selling property; and is owner of property on same street. Thinks $2,000 would have been a fair price.

Mr. J. S. Ewell, keeps a livery, and sells stock and feed, and is property owner. Estimates the property at $2,500 to $2,700 on the day of sale.

Mr. James A. Summers, hardware merchant, on same street. Property was worth somewhere in the neighborhood of $3,000.

Mr. George W. Summers, formerly clerk of court and recorder, now notary public and insurance agent. The property at that time was worth from $1,800 to $2,000.

Mr. Horace Trahan, real estate owner. The property was worth about $2,400 to $2,500.

Mr. S. D. Rowe, butcher. The property was worth about $2,500 to one having the money for improving it.

Mr. Valery Le Blanc, owner of property on the same street, estimates that the property was worth about $2,000 at the time of the sale.

Mr. Eli Wise, prominent business man and property owner, thinks that the property was worth from $2,500 to $3,000.

Mr. S. P. Watts, business not stated, but evidently a very intelligent witness, thinks $2,500 would have been a good price.

Of these witnesses adduced by defendant the following are property owners on State street: W. W. Edwards, D. L. McPherson, Joseph S. Ewell, J. C. Le Blanc, Jean Abadie, Valery Le Blanc, John B. Shaw, E. M. Stebbins, and Eli Wise.

Counsel for plaintiff makes light of this expert testimony, and insists that a much more reliable criterion is the actual transactions that have taken place in the buying and selling, or the bona fide offer to buy or sell, similar property. In this counsel is, in a great measure, right. Purchasers of real estate, as a general thing, do not act without having first gathered all available information, and maturely considered, and their act in purchasing stands for the result or sum of the deliberation, and is, therefore, more reliable than the offhand opinion of experts. But, on the other hand, pieces of real estate are not current on the market, like stocks and bonds. Their purchase is very frequently determined by circumstances peculiar to them or to the purchasers, and their price dictated accordingly. There is also the chapter of accidents. For instance, to go no further than the present case, this sale by Guidry to Laporte would be an unsafe criterion, and would be most decidedly so if the contention of counsel as to the real value of the property was correct. The opinion of the expert who gives his mere impression, derived, he himself knows not how, but necessarily from facts and circumstances with which he has been brought in contact in the course of his business life, represents an average, and is less exposed to this chapter of accidents. Bearing in mind, then, that particular transactions may have circumstances peculiar to themselves, and that, therefore, some circumspection and discrimination must be exercised in accepting them as criterions, we proceed to consider the several transactions adduced for the purpose of comparison.

As a preparation for this discussion it may be well to give a general idea of the situation

of the streets to be mentioned. The property·in question is at the corner of State and Lafayette streets, fronting on State. State street runs north and south; Lafayette street east and west. The next street north of Lafayette is Concord, and the next is Victor. The property is in the block on the west side of State street, in block bounded north by Concord and south by Lafayette, and it is at the south corner of the block.

### Transactions Adduced by Plaintiff.

The sale of a lot at the north corner of the opposite block; that is to say, at the corner of State and Concord. The lot thus sold measures 30 feet on State street and 90 on Concord, and the price was $1,200, and the transaction was contemporaneous with the one we are dealing with.

At the same valuation per square foot, the lot in controversy would be worth $6,000, with the buildings for additional value.

But the witnesses agree that property on Concord street is much more valuable than on Lafayette street, and that the nearer property on State street is to Concord street the more valuable it is. As proof of this, defendant adduces two sales,—one of a lot 30 by 72 feet on Concord street, for $1,000; and the other of a lot 50 by 90 feet on Lafayette street, for $650,—both lots being situated about the middle of their respective blocks, and the two sales having been made at about the same time, the lot on Lafayette street being the lot adjoining the lot in controversy.

If sold at the same price per foot front as the lot on Concord street, the lot on Lafayette street would have brought $1,667.50, instead of $650; and the lot on Concord street, if sold at the same price per foot front as the lot on Lafayette street, would have brought $390. If sold at the same price per square foot as the lot on Concord street, the lot on Lafayette street would have brought $2,497.50; and, if sold at the same price per square foot as the lot on Lafayette street, the lot on Concord street would have brought $311. This would go to show so great a disparity between values on the two streets as to make a comparison of sales of lots at the two ends of the block in question unsafe criterions. Besides, the lot bought at corner of Concord and State streets was bought for the location of a new bank, and seems to have been an exceptionally desirable lot. The officials of the bank, by a unanimous vote, chose to give $1,200 for it rather than $800 for a lot of the same size nearly opposite on State street, but not at the corner.

Plaintiff next adduces the sale made by Laporte to one Le Blanc of part of the lot in litigation in September, 1900,—seven months after the sale by Guidry to defendant. The portion thus sold is a lot 30 feet front on Lafayette street by a depth of 90 feet, the western portion of the lot in controversy. The price was $800.

Judging from the price at which this lot was sold, the lot in controversy would have been worth at the same date at least $4,000, plus the value of the buildings,—a price sufficient to support the present action, even after all allowances made for increase in the value of property in the meantime.

But it seems that this sale, too, was altogether an exceptional transaction, the price having been dictated more by the special need of the purchaser, the owner of the adjoining lot, who needed more room, than by the market value of the property. This purchaser testifies that the lot was not worth more than $200, and that he so told the notary at the time of passing the sale, but that he had to have more room. Several witnesses testify to the excessiveness of the price paid for this lot.

The next transaction adduced by plaintiff is one carrying great weight, and which caused us to hesitate long in estimating the preponderance of the evidence in the case, considering the judge a quo, himself a resident of the town of Abbeville, had given judgment for plaintiff. As president and committeeman of a loan association, the defendant, Laporte, was called upon shortly before his purchase to estimate the property for the making of a loan on it. The committee, Laporte included, came to the conclusion that the association could safely lend $1,900 or $2,200 on the property. The witness is not positive as to which it was. Now, as the rule of the association in making loans was to· require that the property be worth double the amount of the loan, Laporte would thus have agreed to an estimate of $3,800 or $4,400. The two committeemen appear as witnesses, however, and under oath put a

different estimate on the property,—one of $2,500 to $2,600 and the other of $2,000; and, so far as Laporte himself is concerned, there does not enter into the matter any element of estoppel. The two witnesses are disinterested, and are evidently men of high standing.

In the elaborate and very able opinion of the learned judge a quo, a sale made by J. M. Beauxis to the defendant, Laporte, in 1898, of a lot of the same size as the lot in controversy, and adjoining it on State street, at the price of $2,500, is referred to. Defendant offered to prove by the vendor, Beauxis, that the real price was $2,300, and the judge refused to permit the proof on the ground that it would be contradictory of the recitals of the act of sale. It is only as between the parties, and where the act itself is the subject of the litigation, that this rule applies. It was competent for defendant to show that the price of the sale in question was partly fictitious. It was offered as a real price, and, if not such, the fact could be shown.

But even the price of $2,500 would still leave a margin of $1,054 to be overcome before the lesion beyond moiety in the sale we are dealing with would be established. It is not shown that between 1898 and February, 1900, property had greatly increased in value. The rapid increase came later.

### Transactions Adduced by Defendant.

The sales of a lot corner of State and Lafayette, diagonally across from the lot in controversy. The two lots are of the same dimensions, and similarly situated, both being at the corner of State and Lafayette, the one on the east side and the other on the west side of State street, the lot in controversy, however, being nearer to Concord street by the width of Lafayette street. On March 12, 1898, a one-fifth interest in this lot was sold for $230, or at the rate of $1,150 for the whole. On March 24, 1898, another fifth was sold for $300, or at the rate of $1,500 for the whole. On the 30th of April, 1898, the whole of the lot was sold for $1,250.

The next sale adduced is that of the corresponding lot at the opposite corner, with a frontage of 90 feet on State street by a depth of 154 feet. The sale included two other lots of equal size,—one at the corner of Lafayette and St. Charles street, the next street east of State; and the other lot adjoining, with front on St. Charles. This sale was in 1895. The price of the three lots, with the buildings and improvements thereon, was $2,267.

Defendant next adduces a sale of a lot at the corner of State and Victor streets, together with the lot adjoining; the two lots together having a frontage of 160 feet on State street by a depth of 144 feet. The sale was in March, 1901. The price was $750. Victor street is one block from Concord, the order of the streets as we go north up State street being Lafayette, Concord, and Victor. But State street north of Concord is not shown to be a business street, and hence this sale is of little worth for comparison.

The next sale adduced by defendant is that of a lot fronting on Lafayette and adjoining the lot in controversy. The lot measures 50 feet front by a depth of 90 feet. The price was $650, and the date of the sale was December, 1898. On the lot was a $200 building.

In 1894 a lot fronting on State street, and between Lafayette and Concord, and nearer to Concord, measuring 60 feet by 180, was sold for $400.

In January, 1899, a lot alongside of the above, 25 feet by 180, was sold for $425.

### Offers to Buy and Sell Made and Refused.

A day or two after his purchase Laporte offered to sell the property to McPherson. The latter offered $2,500 as an investment, and Laporte declined to sell at that price. McPherson would not consent to give more.

Shortly after the purchase the witness Stebbins offered to buy the property allowing Laporte a profit of $500, and Laporte declined. The witness would not consent to give any more.

Between May and August, 1899, the witness Chauvin offered $1,900 for the lot at the corner of State and Lafayette, diagonally across from the lot in controversy. The owners wanted $2,200, and the bargain fell through.

In 1901, for the same lot, the witness Le Blanc offered $2,000, expecting to get the property at that.

In June or July, 1900, for the lot directly

across the street, at the corner opposite, the same witness offered $2,400 for the lot irrespective of the buildings, and the offer was accepted. The buildings were constructed in 1890. Just prior to their construction the owner offered the lot to the witness J. G. Le Blanc for $2,400, and he declined to buy, although a man of means and a buyer of property. After the buildings had been constructed, the owner renewed the offer to sell at $2,400, plus the cost of the buildings, and the witness again declined.

After making all allowances for the unreliability of expert testimony in determining the value of real estate, and after taking into consideration the weak points of this testimony as brought out on cross-examination, we cannot escape the conclusion that plaintiff has failed to show by a preponderance of evidence that the property in question was at the time of the sale worth $3,554.10 or more.

Mrs. Le Blanc, for her lot just opposite, shown to be of precisely the same value, was asking $2,400. J. G. Le Blanc refused to buy it at that price, considering the price too high. The same witness refused again at the same price some time afterwards, when property had risen considerably in value. If we add to this $2,400 the $700 at which the buildings on the lot in controversy are estimated by those who put the highest valuation on them, we have $3,100; that is to say, we are still $450.10 short of the amount required to make out the lesion beyond moiety.

We think that the preponderance of the evidence is to the effect that the fire that had occurred shortly before had had a depressing influence on the value of the property on State street, and that at the time of the sale confidence in the future of the street had not yet revived. What would be the fate of the street—whether it would be rebuilt and business return to it, and values restored—was still a matter more or less of speculation. That the vendor, by letting it be known that he wanted to sell, might have got a better price, there can be no doubt; and that his mind had been more or less weakened by drink is also beyond question; but this is not made the ground of the action, nor, under the evidence, could it have been. The case is pitched on the ground of lesion

beyond moiety, and must be dealt with accordingly. We think it very plain from the evidence that at the time of the sale the property was not worth, market value, more than twice the amount paid by the purchaser. In fact, from the evidence we should not fix its value at that time at more than $2,500. Under these circumstances we cannot sustain the demand of plaintiff, however much her case appeals to us. Even if the evidence were sufficient to make out a probable case in favor of plaintiff, we should still be compelled to decide against her. The law is well settled that in such cases it is not sufficient to make out a merely probable case, but that the proof must be positive.

In the case of Beale v. Ricker, 7 La. Ann. 667, this court said:

"In all questions of lesion the value of the property sold at the time of the sale is the rule by which the lesion is to be ascertained. If the value is not fixed within a certain range by the evidence, the lesion is a matter of conjecture, and must be considered as not proved."

In Demaret v. Hawkins, 8 La. Ann. 483, the court said:

"The right to rescind a sale for lesion beyond moiety is the only restraint on the liberty of the citizen to bind himself or his property according to the dictates of his own judgment, and the evidence relied on to establish that right should be peculiarly strong and conclusive."

It is therefore ordered, adjudged, and decreed that the judgment herein be set aside, and that the plaintiffs' suit be dismissed, at their cost in both courts.